UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF PENNSYLVANIA


HEATHER WAGNER, et al.,         )   14-CV-7326
                                )
           Plaintiffs,          )
                                )
     vs.                        )
                                )
ALLSTATE INSURANCE COMPANY,     )   Philadelphia, PA
                                )   February 9, 2015
           Defendant.           )   9:38 a.m.


                 TRANSCRIPT OF ARGUMENT ON MOTION
              BEFORE THE HONORABLE JUAN R. SANCHEZ
                 UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:        JAMES C. HAGGERTY, ESQUIRE
                           HAGGERTY, GOLDBERG, SCHLEIFER &
                           KUPERSMITH, PC
                           1835 Market Street, Suite 2700
                           Philadelphia, PA 19103

For the Defendant:         KRISTIN H. JONES, ESQUIRE
                           PEPPER HAMILTON LLP
                           3000 Two Logan Square
                           18th & Arch Streets
                           Philadelphia, PA 19103

                           JOHN R. BROWN, ESQUIRE
                           1600 Market Street, Suite 1416
                           Philadelphia, PA 19103

Audio Operator:            STACY WERTZ

Transcribed by:            DIANA DOMAN TRANSCRIBING, LLC
                           P.O. Box 129
                           Gibbsboro, NJ 08026
                           Office: (856) 435-7172
                           Fax:    (856) 435-7124
                           Email:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

ARGUMENT ON MOTION:                                    PAGE

        Ms. Jones                                   3, 18

        Mr. Haggerty                                    8

        Mr. Brown                                      15

        The Court - Decision                           21

1       (The following was heard in open court at 9:38 a.m.)

2       (Audio recording begins as follows):

3          THE COURT:  -- but the discovery, I mean, I could

4   see -- I could see bifurcating the case for trial on the issue

5   of bad faith and other, but the discovery is almost the same.

6   It's central to the question of whether there's a breach of

7   contract or not on its evaluation of the claim, which is the

8   basis of the -- of the bad faith claim.  So I think they

9   intertwine.

10         MS. JONES:  If I may, Your Honor, use the example of

11  the claim diary in this case, which is Allstate's record of

12  how it's handled the claim, it's completely irrelevant to the

13  value of plaintiff's, you know, UIM claim.  It doesn't -- you

14  know, it's not her medical records.  It's not her wage loss

15  records.  It doesn't go to the severity of the seriousness of

16  her injuries.

17         But on the bad faith claim, we concede it would be

18  completely relevant, the steps that Allstate took, what it

19  considered in evaluating her claim and whether it acted

20  reasonably.  But, for instance, if we gave up that claim diary

21  as part of combined discovery, that contains our work product,

22  with respect to how we valued the claim, our adjuster's

23  thoughts and mental impressions.

24         THE COURT:  But that's central to the bad faith

25  claim, isn't it?

Jones - Argument                                                4

1              MS. JONES:  Yes, I completely agree that it's

2    irrelevant --

3              THE COURT:  Right.

4              MS. JONES:  -- to the UIM claim.

5              THE COURT:  But they're connected, aren't they?  I

6    mean, the basis of the breach of contract is what?

7              MS. JONES:  The basis of the breach of contract --

8              THE COURT:  You need to be out because you disagree

9    as to the value of the claim.

10             MS. JONES:  Right.  Pure valuation of the claim,

11   right?

12             THE COURT:  Right.

13             MS. JONES:  Whereas the bad faith claim is pure

14   handling of the claim.  Pure handling; what we did, what steps

15   we took when; whether we acted fast enough; whether we took

16   into consideration the right factors.  I think that the

17   issue --

18             THE COURT:  Well, that goes -- doesn't it go all to

19   the issue of whether the -- your bad -- what you did and how

20   you handled it or how you evaluate it, forms the basis of the

21   breach of contract claim, doesn't it?

22             MS. JONES:  To the extent the breach of contract

23   claim seeks something other than UIM benefits, yes.  If

24   there's a breach of good faith and fair dealing piece of that,

25   sure.  But otherwise, you know, the UIM claim is strictly how

1   seriously was she injured.  It has nothing to do with the

2   handling of the claim.

3            THE COURT:  Very well.  But -- but you will agree

4   that they overlap?

5            MS. JONES:  There's some overlap, Your Honor, I -- I

6   would not disagree with that.  But what I would say is that

7   the overlap is not significant enough to put Allstate's work

8   product in jeopardy, and create the discovery and other

9   evidentiary issues that are going to be a problem if we do

10  this together.

11           So, for instance, if we're still valuing the claim,

12  if we're still evaluating it, if we're still considering its

13  value for purposes of this litigation, having simultaneous

14  discovery on bad faith effectively lets Mr. Haggerty sit next

15  to our adjuster while our adjuster's evaluating the claim for

16  purposes of this litigation.

17           THE COURT:  Well, isn't that what the basis of

18  the -- of the breach of contract is, because there's a --

19  there's a sort of a covenant or good faith in dealings with

20  your insured in terms of the breach of contract claim, and out

21  of that and how the claim was handled comes about the bad

22  faith claim.  That's the problem with these cases, you know.

23  I know that you have a dispute as to the valuation, but -- but

24  they claim you mishandled it.

25           MS. JONES:  Sure.  No doubt.

1          THE COURT:  You didn't value it properly.

2          MS. JONES:  Sure, Your Honor.  And that's why our --

3     our request is, take the pure UIM piece and separate it out

4     from the bad faith and the breach of duty of good faith and

5     fair dealing claims.  Let the UIM go first.  Let us figure out

6     whether there's even any basis for bad faith here, before we

7     take the resources and the time and the discovery battles that

8     will ensue on the bad faith piece.

9          THE COURT:  I don't anticipate -- I don't anticipate

10    a lot of -- I think most of it is overlap.  I don't anticipate

11    the -- in terms of the overlap, I don't anticipate that it

12    will be that much more.  The entire claim file will be

13    available to him, right?

14         MS. JONES:  Well, except for Allstate's work

15    product.  I mean, we -- so, for instance, in this particular

16    case, not Mr. Haggerty, but the plaintiff's counsel who had

17    the case before him, threatened litigation very, very early on

18    in this case, in fact before they even turned over medical

19    records.  So as we're -- as Allstate is handling this claim,

20    prior to litigation, it's doing so in anticipation of

21    litigation.  From the very earliest moments in this UIM claim,

22    we had reason to believe we were going to be sued.  So the --

23    the adjuster's entries in the claim diary in which he's taking

24    the steps to handle and process and evaluate, those are

25    protected work product.

1           THE COURT:  Okay.  Well, we always have in cases --

2    I mean, it's not unusual to have those issues come up in every

3    single case that we have.  How would this be any different?

4           MS. JONES:  Well, what we would --

5           THE COURT:  You could -- you could redact and

6    produce and he'll file a motion if he wants more.

7           MS. JONES:  And I understand that, Your Honor.  We

8    would -- our position is, we would be more than happy to

9    litigate the UIM and then give him the whole claim diary with

10   no redactions after the UIM claim is resolved, so that we can

11   avoid those battles in between with redaction and motions.  We

12   -- we acknowledge that as part of a bad faith claim, if the

13   UIM weren't mixed into this, he'd be entitled to the entire

14   claim diary.

15          THE COURT:  Okay.  So -- so tell me, what is the

16   essence of the disagreement as to valuation?

17          MS. JONES:  The essence of the disagreement --

18          THE COURT:  Right.

19          MS. JONES:  -- as to valuation?

20          THE COURT:  Right.

21          MS. JONES:  The essence here is truly the severity

22   of her injuries and whether this is a policy limits claim or

23   not.

24          THE COURT:  Very well.  Let me hear from Mr.

25   Haggerty.

1          MR. HAGGERTY:  Yes, Your Honor.  Your Honor, you've

2   put your finger right on -- right on the issue.  This is a

3   breach of contract claim.  Often insurers would like uninsured

4   and underinsured motorist cases to proceed forward just as a

5   tort case would.  It's not a tort case.  It's an underinsured

6   motorist claim; have they fulfilled their obligations under

7   the contract?  Was there a contract; was there a breach of

8   that contract, and were there damages?

9          THE COURT:  Right, but -- but the bad faith is a

10  separate claim as to how they handled it --

11         MR. HAGGERTY:  Yes.

12         THE COURT:  -- and how they valued it.  You are in

13  disagreement as to what's the worth of the -- what is the

14  value of the case.

15         MR. HAGGERTY:  Yes, sir.

16         THE COURT:  So the only way that it could be -- it

17  could be decided as to what the valuation of the case is, is

18  to submit it to the jury.  The jury will decide what the value

19  of the case is, right?

20         MR. HAGGERTY:  They will determine what the value of

21  the case is.  But, regardless of their evaluation, it does not

22  mean that there's no bad faith.  If they only said it's worth

23  25,000, they still could have handled it in bad faith.  They

24  could have delayed it, they could have obfuscated, they could

25  have done many things.

1          THE COURT:  Right.

2          MR. HAGGERTY:  They may have hit the right value,

3    but they still may have handled it in bad faith.

4          THE COURT:  Okay.  So the -- so the ques -- so the

5    bad faith claim is how -- how it was handled.  But why can't

6    that be bifurcated and why shouldn't it be bifurcated?

7          MR. HAGGERTY:  Well, there's -- the primary reason,

8    Judge, is that -- and I think it goes to -- first of all, I

9    think you're right that discovery is essentially the same and

10   it should go forward, and if there are particular issues in

11   discovery -- because we're arguing these in the abstract, all

12   these --

13         THE COURT:  Right.

14         MR. HAGGERTY:  -- things they're trying to protect.

15   And as Your Honor suggested, they can redact and I can then

16   file a motion.  But the primary reason is, is that most of the

17   time when the cases are severed and stayed, it's in state

18   court because state court has a different procedure.  In state

19   court, the bad faith case is heard by the judge alone.

20         THE COURT:  Right.

21         MR. HAGGERTY:  In federal court, it's heard by the

22   jury.  So if you sever and stay, what they want is, they want

23   me to try this case twice.

24         THE COURT:  But I don't have to sever.  I could -- I

25   think we're talking two different things.  If we're talking

1   for purposes of discovery, you could, for example, have joint

2   discovery on both claims, --

3              MR. HAGGERTY:  Exactly.

4              THE COURT:  -- the bad faith claim and the breach of

5   contract claim.  However, that doesn't mean that you get to

6   submit in federal court, where they have a right to a jury

7   trial, both issues to the jury at the same time.  They could

8   be bifurcated to -- to sort of accomplish the same thing that

9   is accomplished in state court, where the judge decides the

10  bad faith and the jury decides whether there was a breach of

11  contract.

12             MR. HAGGERTY:  As long as we keep the same jury, I

13  agree, yes.

14             THE COURT:  Sure.  You could bifurcate it.

15             MR. HAGGERTY:  Yes.  Yes.

16             THE COURT:  We could do that very easily.  They

17  could arguably come back.

18             MR. HAGGERTY:  I agree, Your Honor.

19             THE COURT:  If there's no breach -- I suspect that

20  you're saying even if there's no breach, the case will -- will

21  still go forward, right?

22             MR. HAGGERTY:  Well, I don't -- I don't know what's

23  in their claim file.

24             THE COURT:  Yeah.

25             MR. HAGGERTY:  All I can see is how they've treated

1  my client.  And it may be if a jury comes back and says the

2  case is worth $2,000, well, then I have to reevaluate whether

3  or not I want to proceed with the bad faith.

4          THE COURT:  Right.  Okay.  So why -- why -- which

5  makes the argument that they're trying to make, why jump the

6  gun and give bad faith discovery at this stage of the game?

7  But, anyway, I could -- you could agree --

8          MR. HAGGERTY:  Because then I have to try my case

9  twice, Judge, because I don't have any bad faith discovery.

10 I've got to try the case, --

11         THE COURT:  It would be -- yeah, it will be a waste

12 of -- yes.

13         MR. HAGGERTY:  -- we have to get it, and then I have

14 to do the bad faith discovery and come back with a new jury

15 and put the whole case on again because it's relevant, not

16 just the number, but how they handled each aspect of the case,

17 how they evaluate it, and I got to put on every doctor, I've

18 got to put it on again and do it twice, and that's just not

19 right.

20         THE COURT:  Right.  I agree.  But you certainly --

21 you certainly agree or at least can accept the fact that even

22 though we may have discovery on both issues, at this stage I

23 could bifurcate for trial the two issues --

24         MR. HAGGERTY:  Yes.

25         THE COURT:  -- and submit to the jury --

1              MR. HAGGERTY:  Yes.

2              THE COURT:  -- the liability issue first --

3              MR. HAGGERTY:  Yes.

4              THE COURT:  -- and breach of contract, and then

5    depending on what happens, --

6              MR. HAGGERTY:  Right.

7              THE COURT:  -- we may go to the second stage, right?

8              MR. HAGGERTY:  Exactly, Your Honor.  In fact, Your

9    Honor, if I may, what I had suggested to defense counsel is,

10   which we've done in some other cases down here in federal

11   court, is that we have stage discovery.  We first have

12   discovery only on the UIM case, and then we have a settlement

13   conference to see where the case goes.  If it doesn't settle

14   or it settles and we still think we want to pursue the bad

15   faith, then we have a short period of time for bad faith

16   discovery.  That satisfies their -- their concerns that

17   they're giving up everything.  But I think your -- I think

18   honestly -- honestly, your solution is a better one, which is

19   we do all the discovery and then if necessary we bifurcate

20   trial.

21             THE COURT:  All right.  Look, tell me a little bit

22   about the -- tell me about the facts of the case, why you have

23   such a big disagreement as to the value of case.  What

24   happened here in state -- in the underlying case?

25             MR. HAGGERTY:  In the underlying case, an individual

1  named David Novatka, the case was in Schuylkill County, he

2  lost control of his vehicle and crossed the center line and

3  struck my client's vehicle.

4          THE COURT:  Liability is not an issue then, right?

5          MR. HAGGERTY:  I don't believe so.

6          THE COURT:  What are the injuries then?

7          MR. HAGGERTY:  The injuries, she sustained a

8  traumatic head injury.  She sustained aggravation of

9  preexisting degenerative conditions to her back and neck.  She

10  sustained an injury to her knee.  She continues to have pain,

11  headache, disability as a result of the accident, as that's

12  what we've outlined so far.

13          THE COURT:  So what is the head injury; what

14  happened -- what is -- what is the head injury?

15          MR. HAGGERTY:  She --

16          THE COURT:  You say traumatic head injury.  What do

17  you mean?

18          MR. HAGGERTY:  She has -- she continues to have

19  headaches and migraines, and as a result is unable to work.

20  That -- that combined with her injuries to her -- her back and

21  neck.

22          THE COURT:  And so what was the -- what happened to

23  -- what was the -- what was your demand here?

24          MR. HAGGERTY:  Your Honor, prior counsel had this

25  and referred it to me, when it became obvious they were going

1    to have to put it into suit.  I believe he demanded the

2    $200,000 policy limits.  There was $25,000 paid by the insurer

3    for the tort feasor in the underlying case.  An offer of

4    $25,000 was made, and there was nothing further.  I can't say

5    that the case is definitely a policy limits case, Your Honor,

6    but it's more than a $25,000 case.

7              THE COURT:  But the demand was policy limits, 200?

8              MR. HAGGERTY:  Yes.

9              THE COURT:  Did he give an alternate demand?

10             MR. HAGGERTY:  I don't think he did.

11             MS. JONES:  No.

12             MR. HAGGERTY:  No.

13             THE COURT:  So -- so if you have a demand that's

14   $200,000 and there's an offer of 25 and you don't lower the

15   demand, you're basically seeking -- seeking policy limit, how

16   is there bad faith, if they disagree with you that it's not a

17   policy limit, and you just told me that it's not a policy

18   limit?

19             MR. HAGGERTY:  Well, because what happens, what

20   these insurers do, Judge, it's different than a third-party

21   case.  In a third-party case, the insurer can do whatever they

22   want to the plaintiff because there's no -- there's no privity

23   of contract.  There's no good faith covenant of fair dealing.

24             In a UM and UIM situation, this is their own

25   insured, and what these carriers do, most of them do, is

1   they'll evaluate a case within a range and they'll say -- and

2   I don't know what their valuation is, what their range is, but

3   they -- they may say, we think this case is worth between 150

4   and $200,000.  Then they go -- but they make an offer of

5   $25,000.  So this is their own insured they're purposely

6   trying to low ball.

7         Now, if their own insured takes $25,000 on a case

8   that they think is worth 150 to 200, then, yeah, I believe

9   that's bad faith.  I believe that they have a duty to

10  negotiate in what they think is a fair range because it's

11  different than the third-party context.  So they have a duty

12  of good faith and fair dealing to their insured.  They have to

13  treat them fairly.  They can't try and low ball them and try

14  to get it for much less than it's worth.

15        THE COURT:  Okay.  And what -- what is your -- so

16  you agree it's not $200,000.  What is your valuation of the

17  case?

18        MR. HAGGERTY:  Your Honor, I'm sorry, I'm not

19  prepared to tell you that today because I took this case only

20  over recently from referral counsel and it's a great, big

21  file, and we wanted to put the complaint together and get this

22  file and -- and that's where I am on the case.  I could

23  respond to Your Honor's question by the end of the week.

24        THE COURT:  Okay.  Very well.  Anything else?

25        MR. BROWN:  Your Honor, if I can just be heard for a

1    moment.

2          THE COURT:  Yes, you may.

3          MR. BROWN:  Only on the issue of UIM because I defer

4    to co-counsel on the bad faith claim.  But I just want for

5    purposes of the record for it to be clear, and I don't believe

6    in any way that Mr. Haggerty misspoke, I think he probably may

7    have confused this with another matter, but the underlying

8    settlement in the case was $50,000.  It was Donegal Insurance

9    for the tort feasor.  They paid their full $50,000 to the

10   insured.

11         Now, after that, there was this demand which he

12   spoke of for $200,000, and that's based on the fact that the

13   plaintiff insured here had limits of $50,000 per person,

14   $100,000 per occurrence, and they had stacked insurance

15   coverage with four vehicles.  So when you multiply the $50,000

16   underlying per person coverage times four, you came up with

17   the 200,000.

18         Now, based on the settlement, the underlying tort

19   feasor of $50,000, Allstate evaluated the case and made an

20   additional offer of $25,000 over and above the 50 that the

21   insured had already received, valuing the case at that point

22   at $75,000.

23         Now, the injuries in the case, as Mr. Haggerty

24   alluded to, there was a head injury, which was diagnosed by a

25   physician as being a "mild concussion" with some subsequent

1    headaches afterwards.  And as Mr. Haggerty also pointed out,

2    there were preexisting conditions of this person's low back,

3    thoracic spine, cervical spine, whatever, and the diagnosis

4    was that there were strain and sprain injuries affecting the

5    muscles of -- of the spine, and the evaluation was that these

6    were not permanent substantially serious injuries; they were

7    of a transient nature, and the valuation was made on that

8    behalf.

9         So I only rise to speak to that factual aspect of

10   the case with regard to UIM.  Any additional comments on the

11   bad faith, I'll defer to co-counsel.

12        THE COURT:  Very well.  On the pre -- on the head

13   injury and all that, you're saying that the sprain, stain, and

14   the other injuries to the back were -- were transient, not --

15   or the head injury, the mild concussion as well?

16        MR. BROWN:  There was a diagnosis of a mild -- "mild

17   concussion," and that was actually taken from a medical

18   examination that was done, an independent medical examination

19   was done.  So it was a mild concussion with subsequent

20   complaints of headaches.  Certainly those are subjective

21   complaints which cannot be quantifiably or objectively proven;

22   they come from the subject, and she does claim that she has

23   these continuing headaches.

24        The actual objective injuries that from my

25   understanding of my review of the file materials on this was

1   that, again, she had preexisting degenerative disc disease

2   affecting the spinal cord, and because of her preexisting

3   injuries, she had an overlay of sprain and strain injuries to

4   the musculature that supports the vertebrae.  And Allstate's

5   position in evaluating the underlying claim was that such

6   injuries, again, are of a transient nature.  They heal.  They

7   are not permanent.  They are not incapacitating.  They're not

8   debilitating.  That's the reason why the case was evaluated in

9   the manner it was long before either Mr. Haggerty got involved

10  or myself, for that matter, on the breach of contract.

11          THE COURT:  Okay.

12          MS. JONES:  Briefly, Your Honor, on the bad faith

13  and breach of contract case.

14          THE COURT:  Go ahead.

15          MS. JONES:  At the outset, I want to make clear that

16  when I refer to plaintiff's counsel here, it's not Mr.

17  Haggerty, --

18          THE COURT:  Right.

19          MS. JONES:  -- it's his predecessor counsel.  But

20  the reason we believe, Your Honor, that the bad faith claim is

21  premature and should not proceed at this point is, it really

22  has two bases: The first is bad faith failure to settle, and

23  the second is bad faith delay.  And as Your Honor pointed out,

24  when Allstate makes a reasonable settlement offer and the

25  other side refuses to negotiate and says, we're going to file

1    suit, and that's the only response we get, we can't negotiate

2    against ourselves.  And while negotiation is an art and

3    refusal to negotiate within any range whatsoever other than

4    the policy limits, isn't bad faith on Allstate's part.

5            With respect to bad faith delay, Your Honor, any

6    delay here is squarely attributable to plaintiff's counsel.

7    He waited two years to file the UIM claim.  After that, it

8    took him another year to get us the medical records.  We got

9    the medical records within 30 days.  We made the $25,000

10   offer.  He said, I'm going to file suit, that was his

11   response, this is a policy limits case.  He waited over a year

12   to file suit.  When he filed suit, there was a rule.  It took

13   another seven months to get a complaint.  There's no delays on

14   Allstate's part here.  We were waiting on plaintiff's counsel

15   the entire time.  That's why we believe, Your Honor, that

16   there's no basis for a bad faith claim at this point in time.

17           THE COURT:  But that would be a subject of a motion

18   for summary judgment.

19           MS. JONES:  Yes.  Thank you, Your Honor.

20           THE COURT:  So we still got to have discovery.

21           MS. JONES:  Yes, Your Honor.

22           THE COURT:  And it seems to me that you could have

23   discovery simultaneously.  I could deal with any of the issues

24   that may come up with regards to work product or privilege as

25   it comes up or you could agree to stage the discovery.  But

1    you could probably do this in 90 days.  Usually my typical

2    order is 90 days for discovery.  So any reason why you cannot

3    accomplish that in the next 90 days for discovery?

4              MR. HAGGERTY:  No, Your Honor.  The only thing that

5    may slow things up is, they're not going to turn over their

6    file and they're going to redact it, and we're going to have

7    to file motions and be back before Your Honor.  That's all.

8              THE COURT:  Right.  But they're at least entitled to

9    redact, and you're going to have to establish that you're

10   entitled to it.

11             MR. HAGGERTY:  Sure.  But they'll do the same thing

12   in depositions, they won't let me ask questions and whatever,

13   whatever.

14             THE COURT:  Very well.  So it seems to me that -- on

15   the other hand, if you're prepared to see my magistrate judge

16   and try to get the case settled at this stage, are you

17   prepared to do that?

18             MR. HAGGERTY:  I'd have to consult with my clients.

19   I don't see any reason why it might not be fruitful to try

20   that now, Your Honor.

21             THE COURT:  Would you be willing to see my

22   magistrate judge at this stage?

23             MR. BROWN:  Your Honor, just as with Mr. Haggerty,

24   I'd have to consult with my client, the claims representatives

25   at Allstate.  I'd be more than happy to do that and get back

The Court - Decision                                    21

1    to the Court --

2              THE COURT:  Very well.

3              MR. BROWN:  -- in an expeditious manner.

4              THE COURT:  Well, discovery can be very expensive

5    very quickly, as you well know, and I won't be entertaining a

6    lot of motions very quickly.  But --

7              MR. HAGGERTY:  Your Honor, if we could get back to

8    you on the settlement conference within 48 hours?

9              THE COURT:  I would appreciate that so I can sign a

10   referral fee.  In the meantime, this is what I intend to do.

11   I'm going to give you a discovery cutoff deadline of April

12   23rd, 2015.  Any and all discoveries on both issues will have

13   to be completed.  Any expert reports, due May 7th, 2015 by the

14   plaintiff.  The defense will be due May 14th, 2015.

15   Dispositive motions, May 28th, 2015.  Responses, June 11th,

16   2015.  If you have not already settled the case and have not

17   seen my magistrate judge, I will touch bases with you in the

18   middle of June; June 18th, 2015.

19             After that, as you well know, at the tail end, it

20   will -- the case will get very expensive very quickly because

21   dispositive motions in limine will be due June 25th, 2015;

22   responses, July 9th, 2015.  All your pretrial memos will be due

23   July 9th, 2015.  Pretrial memorandums by both defense and the

24   plaintiff, requested points for charge, voir dire examination

25   questions, verdict slip, and you should follow my standard

1   operating procedures, and I will give you a lot of guidance on

2   how to prepare those documents, so that we can have a

3   meaningful final pretrial conference, which will be held July

4   13th, 2015.  And your case will be on the trial pool for July

5   20th, 2015.

6            Any questions?

7            MR. HAGGERTY:  No, Your Honor.

8            MR. BROWN:  No, Your Honor.

9            MS. JONES:  No, thank you, Your Honor.

10           THE COURT:  Okay.  So that's the order I'm going to

11  sign.

12           MR. HAGGERTY:  Should we -- should we --

13           THE COURT:  This is what I intend to do at this

14  point in time.  I'm going to deny the motion to sever the

15  discovery.  You could have discovery on both issues

16  simultaneously.  The question of trial, whether I try both --

17  both issues at the same time or separately, I will deal with

18  it at trial because I think that it makes a lot of sense to

19  bifurcate this for purposes of trial, so that the jury could

20  just concentrate on the issue of whether there's a breach of

21  contract or not.  If there is a breach of contract, then we'll

22  -- we'll try the second issue before -- before that same jury,

23  and that could be done very easily in the course of the trial,

24  and I could give you guidance at the final pretrial

25  conference.

1             Any questions?

2             MR. HAGGERTY:  In responding to Your Honor about --

3    within the 48 hours, may we do so just by telephone to your

4    chambers?

5             THE COURT:  You may.  Just call my law clerk, Erin

6    Borek, and let her know.

7             MR. HAGGERTY:  Great.  Thank you.

8             THE COURT:  And my magistrate judge, Marilyn

9    Heffley.  So if that makes a difference, I will give you her

10   name so that you know.  Okay.  Thank you.

11            MR. HAGGERTY:  Thank you, Your Honor.

12            MS. JONES:  Thank you, Your Honor.

13            MR. BROWN:  Thank you, Your Honor.

14            THE COURT:  You're welcome.

15       (Proceedings concluded at 10:02 a.m.)

16                       * * * * *

17             C E R T I F I C A T I O N

18            I, Roxanne Galanti, court approved transcriber,

19   certify that the foregoing is a correct transcript from the

20   official electronic sound recording of the proceedings in the

21   above-entitled matter.

22

23   _____        April 9, 2015

24   ROXANNE GALANTI

25   DIANA DOMAN TRANSCRIBING, LLC